**Application of MARRIOTT CORPORATION.**

**Patent Appeal No. 75–538.**

United States Court of Customs and Patent Appeals.

June 30, 1975.

Rehearing Denied Sept. 4, 1975.

---

Browne, Beveridge, DeGrandi, Washington, D. C., attorneys of record, for appellant; Francis C. Browne, Joseph A. DeGrandi, Richard G. Kline, Washington, D. C., of counsel.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; John W. Dewhirst, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

MARKEY, Chief Judge.

This appeal is from a decision of the Trademark Trial and Appeal Board, 184 USPQ 53 (1974), affirming the examiner's refusal to register WE SMILE MORE because it did not serve "as a mark of origin." We reverse.

## Use of the Mark

In November 1964 Marriott's predecessor in title, Camelback Inn Company, adopted and first used in commerce WE SMILE MORE as an advertising and promotional phrase to distinguish its "hotel, restaurant, and convention services." The mark was displayed on lapel buttons pinned to uniforms worn by Camelback Inn employees. Similar lapel buttons were supplied nationwide to customers and potential customers of Camelback's services.

In June 1966, Ramada Inns, Inc., began use of WE SMILE MORE on a circular background in printed advertisements for "hotel and inn services."

## PTO Proceedings

On January 18, 1967, Ramada applied for registration of WE SMILE MORE on the Principal Register.[1] The mark was published for opposition on December 19, 1967.

During the pendency of Ramada's application, Marriott acquired the Camelback Inn Company and all its assets. As successor in interest to Camelback's right in WE SMILE MORE, Marriott filed a notice of opposition[2] to the Ramada application and proceedings were instituted on April 9, 1968.

On May 2, 1968, Marriott filed its own application[3] to register WE SMILE MORE. That application, the subject of the instant appeal, was initially rejected because the mark was so presented in the specimens that it "would be looked upon by the public as nothing more than a slogan of an advertising nature, and not as a mark to indicate the origin of applicant's services."

Later in May 1968, Marriott instituted an action in Arizona to enjoin Ramada's use of WE SMILE MORE. Because the mark had become involved in that litigation, the PTO suspended Marriott's opposition on April 17, 1969. Eight months later, *ex parte* prosecution of Marriott's application was suspended pending termination of the opposition. Simultaneously, the examiner's final rejection, the basis of which was that of the initial rejection, was withdrawn in view of the "similar factual situation" presented by the examiner's allowance of the Ramada application.

## Arizona Proceedings

The trial of the action in Arizona,[4] based on Marriott's prior common law rights, ended with a decision dated

---

1. Application serial No. 262,808.

2. Opposition No. 48,345.

3. Application serial No. 297,144.

4. Superior Court of the State of Arizona in and for the County of Maricopa (Phoenix, Arizona) Civil Action No. C–212222.

March 11, 1970, in Marriott's favor. On appeal to the Court of Appeals of the State of Arizona, the trial court decision was reversed. *Ramada Inns, Inc.* v. *Marriott Corp.*, 16 Ariz.App. 459, 494 P.2d 64 (1972). The appellate court summarized its opinion as follows:

> We fail to see that the words "we smile more" are of such uniqueness so as to permit either plaintiffs or defendant to have their exclusive use. The record is devoid of any evidence that the phrase "we smile more" as used by Ramada confused the general public into believing that it denoted Camelback Inn. We concur with defendant's statement that no one can have the exclusive right to the use of these three words because they are common, ordinary, descriptive words and do not apply to any particular person or organization.

A Petition for Review was denied in a split decision of the Arizona Supreme Court.

### Further PTO Proceedings

■ The Arizona appellate decision was followed by resumption of the opposition in the PTO. Ramada proposed that both parties withdraw their applications and the opposition be dismissed in view of the Arizona determination. Marriott suggested that the opposition should be sustained and leave granted to convert its pending application to one for a concurrent use registration. The board dismissed the opposition and remanded Ramada's application to the examiner for reconsideration in light of the Arizona ruling, upon which it commented:

> Where, as in this instance, a court of competent jurisdiction has adversely decided opposer's claim of exclusive use of the phrase "WE SMILE MORE", this issue should not be re-tried by the Board. See: Midland In-

ternational Corporation v. Midland Cooperatives, Inc., 434 F.2d 1399, 58 CCPA 756 (CCPA, 1970).

*Marriott Corp.* v. *Ramada Inns, Inc.*, 175 USPQ 767, 768 (TTAB 1972). Though the issue in an opposition is the applicant's right to register and not opposer's right to exclusive use, neither party appealed that board decision. We are told that Ramada's application, like Marriott's, is still pending.

Upon resumption of *ex parte* prosecution of Marriott's application, the examiner cited the Arizona decision and, although his view was that it was not binding, he refused registration because WE SMILE MORE "is not a mark of origin, and is incapable of exclusive use or appropriation." In rebuttal, Marriott cited a number of registered slogan marks of others which begin with the common word "we," e. g., WE TRY HARDER, WE SIT BETTER, WE MOVE THE EARTH, etc. The examiner considered the citations irrelevant. The examiner's final rejection maintained his previous position and additionally noted that the mark "simply does not meet the statutory definition of a service mark in Section 45."

### Board

Emphasizing the Arizona appellate opinion, the board stated that "a court of competent jurisdiction" decided that the mark is incapable of exclusive appropriation. Quoting the first and third sentences of the penultimate paragraph of the Arizona appellate opinion quoted above, and the last few words thereof regarding application to "any particular person or organization,"[5] the board concluded that the effect of the Arizona ruling was that others, including Ramada, had rights in WE SMILE MORE equal to those of Marriott. Accordingly, the board upheld the denial of registration because the mark "did not and could

---

5. In its second quote the board stated that the Arizona court "further decided that such *term* [WE SMILE MORE] *does* not 'apply to any particular person or organization.'" [Empha-

sis added.] Of course the Arizona court did not so decide, but stated that the individual "words * * * do not apply * * *."

not distinguish the services rendered in behalf of Marriott Corporation from the services of others," citing Sections 2 and 45 of the Lanham Act.[6]

## OPINION

■ The board erred in finding that WE SMILE MORE fails to meet the criterion for a mark set forth in Sections 2 and 45. There is no evidence of record to support the proposition that WE SMILE MORE "did not and could not distinguish" Marriott's services from those of others.

The great persuasiveness the board saw in the Arizona appellate decision is not apparent to us. The state court, relying on Arizona cases holding that words descriptive of a business may not be exclusively appropriated, concluded that Ramada should not be enjoined from using WE SMILE MORE because (1) the mark is not unique, (2) there is no evidence of actual confusion, (3) the words comprising the mark are common descriptive words, and (4) the words do not apply to any particular person or organization.

Whatever may have been the effect of those considerations under Arizona law, they cannot in this case preclude registration under federal trademark law.

■ Uniqueness is not a necessary characteristic of a slogan serving as a trademark. See *The Trademark Cases*, 100 U.S. 82, 25 L.Ed. 550 (1879). So far as the nature of the mark is concerned, a capability of identifying and distinguishing the source of goods or services is all that is required to support registration. *In re The E. Kahn's Sons Co.*, 343 F.2d 475, 52 CCPA 1201 (1965).

■ Similarly, Section 2(d) (15 USC 1052(d)) speaks of the *likelihood* of confusion. That the second user's employment of the mark *had not actually*

caused the public to be confused would not be determinative in the application of federal law. *Coca-Cola Co.* v. *Clay*, 324 F.2d 198, 51 CCPA 777 (1963); *Fleischmann Distilling Corp.* v. *Maier Brewing Co.*, 314 F.2d 149 (9th Cir.), cert. denied. 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963); *Metropolitan Life Insurance Co.* v. *Metropolitan Insurance Co.*, 277 F.2d 896 (7th Cir. 1960). That factor, if true, is totally irrelevant to the question of the first user's right to registration.

■ Nor do we view the slogan WE SMILE MORE as descriptive of hotel, restaurant, or convention services. That the individual words are common and ordinary is undeniable. That each is descriptive of something is clear. But marks must be considered in their entireties. *The Magnavox Co.* v. *Multivox Corp. of America*, 341 F.2d 139, 52 CCPA 1025 (1965). So considered, the slogan mark before us would at most suggest the facial expression of persons performing the services. It does not describe the services themselves.

■ It is not, of course, required of words serving as trademarks or service marks that they shall, in the board's words, "apply to any particular person or organization." On the contrary, such words are more likely to be unregistrable trade names. The function of a service mark is to indicate continuity of quality of services, i. e., that the quality of services rendered in connection with a particular mark is controlled by a single entity. The name of the "particular person or organization" comprising that entity may be of little or no interest to purchasers and is irrelevant to consideration of the origin-indicating capability of the mark.

■ The first user of a trademark in interstate commerce is entitled to federal registration of that mark.[7] Litiga-

---

6. The board cited *In re Shenango Ceramics, Inc.*, 362 F.2d 287, 53 CCPA 1268 (1966), as sanctioning the ground of rejection, i. e., that the mark did not serve to indicate origin. That case, however, involved an effort to register a functional design feature of a dish.

7. The registration to which the first user is entitled may, of course, be territorially limited. 15 USC 1052(d); 15 USC 1071.

tion concerning rights to use may be predicated on a cause of action different from that concerning rights to registration. See *Aloe Creme Laboratories* v. *Aloe 99, Inc.,* 485 F.2d 1241 (CCPA 1973); *Alfred Dunhill of London, Inc.* v. *Dunhill Tailored Clothes, Inc.,* 293 F.2d 685, 49 CCPA 730 (1961). That a state court has refused, correctly or incorrectly, to enjoin use of a mark by a subsequent user within that state, because it considered the mark unavailable for exclusive use, or for other reasons, cannot of itself bar federal registration of the mark to the first user in interstate commerce.[8] When presented with an application for registration, PTO tribunals must exercise their judgment in applying the Lanham Act provisions relating to registration independently of state court decisions concerning intrastate use. Facts that may be established in such state litigation may be considered, but such facts must be applied in the light of federal law. In determining the right to registration herein, the threshold consideration is that of first use in interstate commerce. When, as here, the evidence is clear that Ramada began use well after Marriott's first use in commerce, such late-comer use by Ramada is irrelevant to Marriott's right to register. Ramada could not succeed, for example, in opposing Marriott's application on the basis of such late use. *Hollowform, Inc.* v. *Delma Aeh,* 515 F.2d 1174 (CCPA 1975). The oath filed with Marriott's application states the belief that no one else has the right to use the mark in commerce. Neither the court decision applicable only in Arizona, nor any evidence of record, contravenes the accuracy of that belief or indicates in any manner that Ramada or anyone other than Marriott has a right to use the mark in commerce.

■■■ We note that Marriott has attempted to convert its application to one for a registration effective in 49 states, in the apparent belief that Ramada has an established right to use the mark in Arizona. Though registration should follow use "as nearly as possible," *In re E. I. duPont de Nemours & Co.,* 476 F.2d 1357 (CCPA 1973), the issue of concurrent registration is not before us and we will not comment on its propriety.

The Arizona appellate decision is an inadequate substitute for evidence to support the board's conclusion that the mark "did not and could not distinguish" Marriott's services from those of others. Indeed, WE TRY HARDER, WE SIT BETTER, and the many other previously registered marks cited by Marriott, along with the passage to publication of Ramada's application to register WE SMILE MORE, would suggest the contrary. Though prior mistakes cannot justify their perpetuation, there is no evidence that such prior registrations were in any manner improper. The slogan WE SMILE MORE is not inherently incapable of identifying a source of services. Marriott's evidence of use, though minimal, is adequate to indicate that purchasers of its services recognize the slogan mark WE SMILE MORE as indicative of a single source of those services.

Accordingly, the decision of the Trademark Trial and Appeal Board is *reversed.*

*Reversed.*

LANE, J., concurs in the result.

---

8. Though the board referred to the Arizona court as one "of competent jurisdiction" with respect to use in the state, no state court has jurisdiction to determine the right to federal registration under the Lanham Act. § 21 (15 USC 1071); and see 2 J. McCarthy, *Trademarks and Unfair Competition* §§ 21:4, 21:6, and 32.2D; E. Vandenburgh, *Trademark Law and Procedure* §§ 10.60–10.62 (2d ed. 1968). The board which considered the opposition and the examiner in the present case specifically recognized that a state court decision could not bind the tribunals of the PTO with respect to federal registration.